Filed 2/3/14  In re Heidi M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re HEIDI M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064522 |
| Plaintiff and Respondent, | (Super. Ct. No. 517056A-D) |
| v. | |
| DENISE M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Denise M. appeals the juvenile court's orders terminating her parental rights to her minor children Heidi M., Josiah M., Jeremiah M. and Y.M. (together, the minors), pursuant to Welfare and Institutions Code section 366.26.[1]  Denise contends the court erred by finding the beneficial parent-child relationship exception did not apply to preclude termination of her parental rights.  We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

The record in this case includes a long history of involvement by the San Diego County Health and Human Services Agency (Agency) with Denise and her five children.[2]  The need for the Agency's involvement centered primarily on domestic violence against Denise by her children's fathers and other men, and Denise's mental health.  The Agency's first report dates back to 2004 when Denise alleged she was being stalked by the father of her oldest child.  Denise's three oldest children, Heidi, Josiah and Jeremiah, were removed from her custody for the first time in 2008 after Denise told police she feared she might hurt herself or them.  At that time, Heidi, Josiah and Jeremiah

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Denise's youngest child, H.N., is the subject of a separate dependency proceeding. Additionally, the fathers of the four children that are the subject of this proceeding are not parties to this appeal.

were four, three and 11 months old, respectively. Denise was hospitalized and the children were placed in foster care.

During this first dependency, Denise began therapy and participated in other services required by her case plan, including parenting and domestic violence classes. While Heidi, Josiah and Jeremiah were out of her custody, Denise became pregnant with her fourth child, Y.M. Denise gave birth to Y.M. in May 2009 and, based on Denise's progress with her case plan, Y.M. remained in her care. Denise faltered periodically in her reunification efforts, but Heidi, Josiah and Jeremiah were eventually returned to her care and the juvenile court terminated dependency jurisdiction in April 2010.

The very next month, however, the Agency received a referral that Jeremiah had a fractured arm without any explanation for the cause of the injury and that Denise's boyfriend had been seen pulling Jeremiah by his injured arm at the medical clinic. Later that month, Denise reported to police she was beaten and raped numerous times by the same boyfriend over a four-day period in her home in the presence of the children. After the first attack in this period, Denise did not take any action to protect herself or the minors from the perpetrator. After the incident, the Agency provided Denise with additional voluntary services throughout 2010 including domestic violence counseling, parenting assistance and psychiatric care.

Despite this assistance, Denise was involved in additional incidents of domestic violence over the next year. Then, in March 2011, Denise was hospitalized after being physically and sexually assaulted in her home by a gang member she was involved with, Jared J. During the incident, Jared choked Denise almost to the point of unconsciousness

3

in front of Jeremiah and Y.M. The minors told social workers they also witnessed sexual interaction between Jared and their mother. Denise claimed Jared stalked her for a month before the assault, threatened her and the children and had broken into the family home multiple times. Less than two weeks before the assault, Denise called the police after Jared threatened to hurt her and her children. After the threats, however, Denise took no action to protect herself or her children from Jared. To the contrary, Denise told police she was trying to work things out with Jared and admitted allowing him to stay in the home and to keep his personal belongings there after he threatened her.

The night of the incident, Denise's neighbors called the police after hearing her cries for help. Jared was arrested and the Agency was contacted. After an investigation, the Agency removed the minors from Denise's care and filed a petition in the juvenile court under section 300, subdivision (b). The petition alleged the children suffered or were at substantial risk of harm by the failure of Denise to supervise or protect them adequately. Specifically, the Agency alleged the minors were "exposed to violent confrontations in the family home" between Denise and Jared, and Denise's inability to protect the minors from ongoing and escalating violence placed them at substantial risk of serious physical harm.

A jurisdiction and disposition hearing was held in April 2011. At the hearing, the court sustained the allegations of the petition, assumed jurisdiction, declared each child a dependant of the court and removed each from parental care. Jeremiah and Y.M. were placed in a foster home together, and Heidi and Josiah were each placed in separate foster

4

homes.  The court ordered liberal supervised visitation for Denise, that she undergo a psychological evaluation and the provision of reunification services.

By the six-month review hearing, the three boys were in foster care together and Heidi was in a separate foster placement.  The Agency reported Denise was participating in the services required by her case plan, but needed additional treatment to learn how to stay out of dangerous relationships.  The Agency recommended the children remain in their current foster homes and the court ordered six additional months of services for Denise.  Shortly after the hearing, the court permitted Denise to begin short unsupervised visits with the children.

A month later, however, Denise was arrested for assault with a deadly weapon after hitting her sister in the head with a beer bottle.  Denise's sister's two young children were present when the altercation occurred.  As a result, the Agency requested Denise's visits with the minors revert to being supervised.  The court granted the request.  Denise later pleaded guilty to the charges, was ordered to complete anger management classes and a restraining order was entered against her.

In the same time frame as her arrest, Denise was kicked out of her domestic violence program for poor attendance and regularly missed therapy.  Denise's therapist reported that when Denise did make her sessions, they involved crisis intervention and not developing a healthy environment for her children.  She also lost her job and was unable to find stable housing.  The Agency enrolled Denise in a family unification program to expedite public assistance housing, but Denise dropped out of the program so

she could be at the hospital with her ex-boyfriend, Angel N., another gang member who was recovering from injuries inflicted by a rival gang.

Before the 12-month review hearing, Denise reported she was pregnant with H.N., who was Angel's child, and that Angel had beaten and raped her when she told him she was pregnant. She also told police and the Agency that Angel and two of her other ex-boyfriends, all three described by her as known gang members, were plotting against her and she feared for her life. Although no longer in Denise's care, Heidi told her therapist she was scared of her mother and alleged Denise had abused her and her brothers.

In its report for the 12-month review hearing, the Agency noted that despite being provided with an array of services, Denise was unable to take the steps necessary to regain custody of her children. In particular, she continued her pattern of entering relationships with dangerous and violent men, including with men that had assaulted or raped her in the past. The report listed eight incidents of domestic violence in which a police report had been filed. The Agency opined there was not a substantial probability of the minors being returned to Denise by the 18-month review hearing and recommended terminating services. The court agreed, finding that returning the children to Denise's custody would be detrimental and set a section 366.26 selection and implementation hearing for October 2012. Denise filed an unsuccessful writ petition challenging the court's findings and orders.

In October 2012, Heidi was living with a foster mother and her three brothers were living with a separate foster family. That family wanted to adopt the three boys, but did not have enough room in their home for Heidi. Although they had a good

6

relationship, Heidi's foster mother did not want to adopt Heidi. The selection and implementation hearing was continued so the Agency could evaluate placement options to keep the siblings together. In late 2012, the Agency found a couple who wanted to adopt all four children.

By the summer of 2013, the minors were living with the prospective adoptive parents and were doing well. In addition, H.N., born the prior fall, was also placed with the family.[3] Denise meanwhile filed two section 388 petitions for modification to have the children returned to her custody. In the first, filed in February, Denise alleged her ability to parent H.N., her completion of anger management and domestic violence programs and her participation in a parenting course constituted changed circumstances. The second petition, filed in July after H.N. was removed from her care, cited a restraining order Denise obtained against Angel and that she moved into a women's program as changed circumstances that supported returning the children to her custody. The juvenile court denied both petitions.

Throughout the dependency proceeding, Denise maintained regular visitation and phone contact with the minors. The visits were for the most part appropriate and positive and the minors were generally happy to see Denise. None of the children, however, were upset when the visits were over. The older three children wanted continued visitation with Denise, but also wanted to stay in their new homes. Heidi told the Agency's social worker she loved her mother, but did not want to live with her and did not feel safe with

---

3    H.N. was taken into protective custody in April 2013 after Denise was involved in another serious incident of domestic violence.

her.  In one of the Agency's reports for the 366.26 hearing, the social worker described Denise's relationship with her younger children as that of a friendly relative, not a parent.

In initial and updated reports prepared for the selection and implementation hearing, the Agency recommended the termination of Denise's parental rights.  By the time of the hearing in July and August 2013, the children had been out of Denise's care for almost two and half years.  Between their two dependencies, Heidi had been in 11 placements, Josiah and Jeremiah in eight and Y.M. in three.  At the hearing, the court received the Agency's reports into evidence and heard testimony from two social workers involved in the case and Denise.  The social workers reiterated the Agency's recommendation that Denise's parental rights be terminated so the children could be adopted and testified all four children were generally and specifically adoptable.  The current social worker assigned to the family also testified the prospective adoptive parents were committed to adopting the children and had an approved home study.

After consideration of evidence and the arguments of counsel, the juvenile court found the children were generally and specifically adoptable and terminated Denise's parental rights.  The court recognized both Denise's commitment to and love for her children and the children's love for Denise, but concluded Denise had not shown the beneficial parent-child relationship exception precluded terminating her parental rights.

DISCUSSION

Denise contends there was insufficient evidence to support the juvenile court's finding the beneficial parent-child relationship exception to adoption did not apply.  She

8

asserts she maintained regular visitation and contact with the minors, had a substantial and positive emotional attachment with them and occupied a parental role in their lives.

A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the

9

Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  Courts have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.,* supra, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent that if severed would result in harm to the child.  (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)  The exception does not require

10

proof the child has a " 'primary attachment' " to the parent or the parent has maintained day-to-day contact with the child. (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534-1538; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

We review an order terminating parental rights for substantial evidence. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D., supra,* 70 Cal.App.4th at pp. 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

Denise argues that the potential harm caused by the termination of her parental rights outweighed the potential benefits of adoption for these four children. The juvenile court's finding to the contrary, however, was supported by substantial evidence.

Although the minors enjoyed Denise's company during visits and showed her affection, they did not rely on Denise to have their needs met. The minors separated easily from Denise after visits and there was no evidence that her absence from their daily lives affected them adversely. Heidi stated she loves her mother, but also that she

11

"does not feel safe with her and is happy to be moving somewhere she can be safe." Both Heidi and Josiah were described by one social worker as having an anxious, unhealthy attachment to Denise during their visits. The social worker described Jeremiah's and Y.M.'s relationship with Denise during their visit as a friendly visitor. She noted they did not need Denise's attention or depend on her to have their needs met.[4]

These facts amply supported the juvenile court's finding the children did not have a " 'significant, positive, emotional attachment' " to Denise such that terminating parental rights would result in great harm to them. (*In re Jason J., supra*, 175 Cal.App.4th at p. 936; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Denise points to no evidence showing the minors would be harmed by severing her rights. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Further, as described, despite being provided with considerable resources to help her change her behavior, Denise continued to expose the minors to considerable violence and to place the children in harm's way. Denise's oldest child, Heidi, repeatedly

_____

[4] Two Agency social workers who worked with the family testified at the selection and implementation hearing. Denise argues the report and testimony of one, Shari Crall, should be discounted because Crall only observed one visit between Denise and the minors. Crall's recommendation, however, was no different from that of the other social worker, Peter Ellew, who had observed 10 to 12 visits. Crall was assigned to the family while the selection and implementation hearing was pending when Ellew left the Agency. Like Crall, Ellew's report and testimony was that there was not a beneficial relationship between Denise and the minors that outweighed the legislated preference for adoption.

12

expressed her fear of being returned to her mother's care and desire to remain with her prospective adoptive parents. At the time of the selection and implementation hearing, the children were doing well in the home of their caregivers who were committed to adopting them and who were meeting the children's medical, developmental and emotional needs. The social workers firmly believed the minors needed a safe, stable and permanent home with parents who could meet their needs, and they should not have to wait for permanency.

The court was entitled to accept the social worker's opinion that the benefits of adoption for the minors outweighed the benefits of maintaining a relationship with Denise. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 191 [child's interest in stable and permanent home is paramount once a parent's interest in reunification is no longer at issue].) The court recognized positive aspects to Denise's relationship with the minors, but concluded the stability adoption would provide outweighed any benefit provided by that relationship. We cannot reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Casey D., supra*, 70 Cal.App.4th at p. 53.) The children, whose needs could not be met by Denise, deserve to have their custody status promptly resolved and their placement made permanent and secure. Substantial evidence supported the court's finding the beneficial parent-child relationship exception to adoption did not apply.

DISPOSITION

The orders are affirmed.

O'ROURKE, J.

WE CONCUR:


McDONALD, Acting P. J.


McINTYRE, J.